United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIE CLARENCE RAY,                    )    No. C 06-4556 SBA (pr)
                                        )
                    Petitioner,         )    **ORDER DENYING PETITION FOR**
v.                                      )    **WRIT OF HABEAS CORPUS**
                                        )
SCOTT KERNAN, Warden,                   )
                                        )
                    Respondent.         )
_____ )

**INTRODUCTION**

This matter is now before the Court for consideration of Petitioner's <u>pro se</u> petition for a writ of habeas corpus under 28 U.S.C. § 2254 concerning his 2000 conviction in the Alameda County Superior Court. Respondent Warden Scott Kernan opposes the petition. Petitioner filed a traverse. For the reasons discussed below, the petition is DENIED as to all claims.

**BACKGROUND**

**I.    Case History**

Petitioner was convicted of first degree murder in the Alameda County Superior Court in October of 2001. He was sentenced to state prison for twenty-five years to life. The state appellate court affirmed his conviction on April 27, 2004. (Resp't Ex. 6.) The California Supreme Court denied review on July 14, 2004. Petitioner then filed a habeas petition in the Alameda County Superior Court, which was denied on March 11, 2005. Petitioner's habeas petition was thereafter denied by the state appellate court on January 30, 2006, and by the California Supreme Court on March 22, 2006.

The instant petition was filed on July 27, 2006. On December 4, 2006, the Court issued an order to show cause and granted Petitioner's motion to proceed <u>in forma pauperis</u>. Respondent filed two separate motions for extensions of time, which the Court granted. Respondent filed an Answer on May 30, 2007. Petitioner filed a Traverse on June 19, 2007. The matter has been fully briefed and is now ready for review on the merits.

1

**II.**     **Statement of Facts**

2          The appellate court described the facts underlying this case as follows:

3      The victim, Kimberly Ray (Kimberly), was strangled to death in the early morning of
        February 26, 2000.

4

5      [Petitioner] and Kimberly were married in 1993 or 1994.  Their relationship was
       described as not very good.  They had gone through separations and each had had
6      relationships with other people.  In the fall of 1999, Kimberly was living in an
       Alameda apartment with her three young children, and [Petitioner] was in custody.
7      Kimberly contacted relatives in Sacramento and told them she wanted to move to
       Sacramento with the children.  She planned that she and the children would stay with
8      her cousin LaDonna Jackson (LaDonna) until she found a place.  In late January
       2000, Kimberly applied for rental housing in Sacramento and gave notice of her
9      intent to vacate her apartment on March 2.

10     Sometime in February 2000, Kimberly told a neighbor she was happy that [Petitioner]
       was being released from prison and would be staying with her and the children.
11     However, after [Petitioner] moved in, Kimberly was not happy, acted "quiet" and
       "nervous," and was anxious to move to Sacramento.  Kimberly told LaDonna that she
12     would be moving to Sacramento just with the children.  LaDonna told Kimberly that
       [Petitioner] was not welcome in her home because she feared for her own safety and
13     the safety of Kimberly's children.  During a phone conversation with her cousin
       Robin Jackson (Robin) the week before her murder, Kimberly said [Petitioner] was
14     always trying to intimidate her.  Robin heard [Petitioner] respond, "I don't have to try
       to intimidate you.  If I want to kick your ass, I'll just kick your ass."  Kimberly
15     sounded "shaken" and said she had to hang up.  A few days before the murder, while
       Kimberly was on the phone with LaDonna, [Petitioner] screamed at Kimberly.  On
16     the day before the murder LaDonna spoke with Kimberly and told her she feared for
       Kimberly's safety and Kimberly should "Come now.  Just leave everything."

17

18     Kimberly's mother, Moselle Hickman, talked to her daughter on the phone sometime
       in February 2000, after [Petitioner] had moved in, and heard [Petitioner] refer to
19     Kimberly as "his bitch," and then hang up the phone.  Hickman said that after
       [Petitioner] moved in with Kimberly, Kimberly no longer seemed happy, "wasn't
20     herself," and there was "always some sort of turmoil."  On February 25, Hickman
       talked to Kimberly numerous times.  Kimberly said she had finished packing and
21     would be moving to Sacramento when her lease was up on February 28 or 29.  When
       Hickman last talked to Kimberly, at about 10:30 p.m. on the evening of the murder,
22     Kimberly sounded "okay."[1]  On cross-examination, Hickman conceded she was
       aware that Kimberly had ongoing correspondence with [Petitioner] between
23     September 1999 and February 2000.  Various letters between them were admitted to
       establish their positive relationship.

24

25     At approximately 12:44 a.m., on February 26, 2000, Alameda Fire Captain Michael
       D'Orazi arrived at Kimberly's apartment after [Petitioner] called 911 to report that she
26     was not breathing.  [Petitioner] led emergency medical personnel to the bedroom
       where Kimberly was lying face up on the floor at the foot of the bed.  [Petitioner] told

27   ─────────────────────

28          [1] On cross-examination Hickman admitted that on the day after the murder she told police
     that Kimberly had sounded "fine and upbeat."

2

United States District Court

For the Northern District of California

D'Orazi that he had tried to resuscitate Kimberly.  Kimberly was declared dead at the scene.

At about 1:00 a.m., Alameda Police Officers Gee and Abreu arrived at the apartment. [Petitioner] and Kimberly's two children, Willie, Jr., age six, and Tequila, were asleep. Jasmine, Kimberly's eight-year-old daughter and [Petitioner]'s stepdaughter, was awake. Jasmine appeared a little "shocked," "confused" and "groggy," but was otherwise fine. [Petitioner] was "very emotional." Gee's examination of Kimberly's body revealed two very small puncture wounds under her chin. Three hair braid extensions, similar to those worn by Kimberly, were found at the end of the bed on the floor. A broken necklace and cross were found in the bed. There were no signs of forced entry into the apartment. Gee contacted the violent crimes unit to assist in the investigation because [Petitioner] was evasive in answering questions, and the condition of the bedroom and Kimberly's body suggested there might have been a struggle.

At about 4:00 a.m., Detective Jones with the violent crimes unit arrived at the apartment where he met Gee and Abreu. [Petitioner] was asleep on the living room couch. Jones entered the bedroom where Kimberly was lying and noted the hair extensions lying on the floor, a lamp was overturned on the floor, the bed sheets were pulled back and a pillow was on the floor. Kimberly's left hand was up and semi-closed in a claw-like position. She had two pinch-like marks under the left side of her chin which appeared fresh. She also had a scratch or scrape on her forehead. Jones opined that a struggle had taken place in the bedroom. Jones noted a fresh mark on [Petitioner]'s chest at the neckline of his shirt. Photos taken of [Petitioner] later that afternoon revealed "a lot of" fresh scratches on his upper arms and forearms. [Petitioner]'s blood alcohol level measured .09 percent and he tested negative for narcotics.

The afternoon after the murder, Alameda Police Sergeants Lynch and Beetle conducted tape recorded interviews of Jasmine and Willie, Jr.[2]

Dr. Sharon Van Meter, a pathologist, conducted Kimberly's autopsy. The examination revealed petechiae (dot-like hemorrhages) over the upper and inner eyelids, forehead, upper face and lips, indicating a significant change in blood flow and oxygen to the head. There were abrasions on the left forehead, behind the right ear, and under the chin, and a contusion-abrasion on the right side of the neck. There were small, rounded scars on the upper and lower arms and upper chest. One of Kimberly's denture which contained two teeth was found in her hair. Based on her examination, Dr. Van Meter opined that Kimberly's death was caused by asphyxia due to strangulation. The strangulation could have been accomplished by hands or a soft object compressing the neck, or a forearm placed under the chin. Dr. Van Meter explained that strangulation can lead to unconsciousness within 30 seconds, and may result in death in one to two minutes, and will certainly cause death in five minutes. If the strangulating pressure is interrupted and the victim is able to take some breaths, it will take longer to cause death. Dr. Van Meter said that the fresh marks found below Kimberly's chin could have resulted from her struggling during the assault. Kimberly's blood alcohol level was .07 percent and was negative for narcotics. Forensic serological testing of material recovered from Kimberly's fingernail clippings was consistent with [Petitioner]'s genetic profile as well as 82 percent of all

---

[2]  The tapes were played for the jury.

3

African Americans.

On April 13, 2000, Jones interviewed Jasmine in Sacramento, where she and her siblings were living with LaDonna.  Jasmine was reserved and did not "really want to talk about what she may have seen."  She did say that "PeeWee"[3] had been to her house twice on the evening that Kimberly was murdered, both times while [Petitioner] was gone.  PeeWee was never considered a suspect in the case.  Willie, Jr., was frightened and did not want to talk.  In April 2001, Jones and Beetle conducted videotaped interviews of Jasmine and Willie, Jr., in Sacramento.[4]  Jasmine was a "lot less reserved," but still appeared to be "kind of holding back a little bit."  She did not mention PeeWee.  Willie, Jr., was "skittish" and again did not want to talk.

<u>Testimony by Kimberly's Children</u>

Ten-year-old Jasmine testified at trial that when [Petitioner] moved in with her and her family, he and Kimberly argued because Kimberly wanted to move to Sacramento with the children and [Petitioner] did not want them to go.  On the day of Kimberly's murder neither Jasmine nor Willie, Jr., wrestled with [Petitioner].  Kimberly's best friends Yolanda and PeeWee came to visit, and left before sundown.  Early in the evening [Petitioner] left the apartment for about five minutes.  When he returned to the apartment Kimberly was talking on the phone to her mother about moving to Sacramento.  Kimberly appeared happy.  [Petitioner] and Kimberly began arguing because he did not want Kimberly to go to Sacramento.  Later that evening, after Jasmine and her siblings went to bed, Jasmine was awakened by a "thump on the wall."[5]  At about the same time she heard Kimberly say, "Stop."  Jasmine woke up Willie, Jr., and tried to get him to "come look," but he went back to sleep.  Jasmine peeked into Kimberly's bedroom.  Standing 10 feet away, Jasmine saw [Petitioner] strangling Kimberly.  [Petitioner] and Kimberly were standing and [Petitioner] was pushing Kimberly against the wall.  Jasmine then woke Willie, Jr., and brought him back to Kimberly's room to "take a look," at [Petitioner] strangling Kimberly.  Jasmine demonstrated that she saw [Petitioner] with both hands around Kimberly's neck with his thumbs across the throat.  Kimberly looked frightened and was scratching [Petitioner], trying to get his hands off her.  Jasmine said she was frightened so she went back to bed.  After the police arrived, Jasmine asked [Petitioner] what happened, but he said nothing.  When asked why she did not tell the police that she saw [Petitioner] strangling Kimberly, Jasmine said, "I don't know.  I was scared."  Jasmine also said she was worried that [Petitioner] "could go to jail forever," and she wanted to go home.

On cross-examination, Jasmine admitted that she did not tell anyone that she had seen [Petitioner] choking Kimberly until April 2001 when she was interviewed by Jones.  She also admitted that she was not truthful when she first talked to the police.

---

[3]  PeeWee, also known as Philip Alarcon, was Kimberly's neighbor and a double amputee who utilized prostheses.

[4]  The videotapes were played for the jury.

[5]  At about 11:30 p.m. on the night of the murder, Kimberly's downstairs neighbor heard two or three unusual "thump noises" coming from Kimberly's apartment.

Jasmine also said she understood that [Petitioner] was not going to be moving to Sacramento because she heard Kimberly say "he can't go."

Eight-year-old Willie, Jr., testified at trial that a couple of days before Kimberly's murder, while Kimberly was talking on the phone to a friend, Kimberly and [Petitioner] argued and [Petitioner] hung up the phone. On the night of Kimberly's murder, he did not hear his parents arguing. He said Jasmine woke him up and told him that his parents were fighting. Willie, Jr., and Jasmine went into the living room to see what was wrong and Willie, Jr., saw [Petitioner] choking Kimberly. Willie, Jr., demonstrated that [Petitioner] had his right arm around Kimberly's neck with his forearm in front of the neck. Willie, Jr., did not know what to do so he went back to his room and went to sleep. On cross-examination, defense counsel elicited that at the preliminary hearing Willie, Jr., testified that he heard his parents arguing, but did not see what was going on.

Testimony by Jailhouse Informant

Claudis Jefferson was in custody at the time of trial for a drug offense, and had three or four prior convictions for "dope" and "domestic violence" in the past 10 years. He met [Petitioner] while they were both in jail in March 2000. Jefferson said [Petitioner] approached him while he was giving legal advice to another cellmate. [Petitioner] said he had been charged with murder, had an upcoming hearing, and wanted "some type of defense," some way "he can wiggle out of it." [Petitioner] told Jefferson he had argued with his wife or girlfriend. "And the bottom line was, he strangled her . . . choked her to death." [Petitioner] also said "some children" had been "aware of him actually on the scene" and he was afraid he was not going to have input into what the children would say. [Petitioner] said he wanted family members to tell the children that [Petitioner] got the scratches on his hands from playing with the children, although [Petitioner] admitted the scratches occurred while he was choking the woman, who was trying to defend herself. [Petitioner] felt he could "beat this" if he could "get to the kids." [Petitioner] told Jefferson that after the strangling he left the apartment and then returned and called 911, trying to make it appear that he found Kimberly dead upon his return. [Petitioner] gave Jefferson various explanations for killing Kimberly. He said they had argued over his using Kimberly's money to buy drugs, and her attempts to "move and leave [him]." Jefferson said it appeared that Kimberly "was trying to get away from [Petitioner] and he wasn't having none of that." According to Jefferson, [Petitioner] referred to Kimberly as "the bitch" and said he "whoop[ed] her ass." [Petitioner] also told Jefferson he had "whooped his [previous] girlfriend" and had done "some violence to her," and they had pulled knives on each other. [Petitioner] told Jefferson he was concerned that his "skin" might be retrieved from under Kimberly's nails.

Jefferson said that a few days after [Petitioner] first approached him, he contacted someone in law enforcement to report what [Petitioner] told him. In May 2000, while in state prison, Jefferson gave a tape-recorded statement to Jones. Jefferson admitted a history as a jailhouse informant, but claimed his motive for testifying against [Petitioner] was that [Petitioner] is "sick" and "needs to be off the street. He preys on women." Jefferson denied receiving any promises or deals in exchange for his testimony, except for his safety in jail and when released from custody.

Testimony Regarding Prior Domestic Violence Incidents

Brenda Boyd met [Petitioner] and began a romantic relationship with him in 1995.

United States District Court
For the Northern District of California

Boyd was aware at the time that [Petitioner] was married, but separated from Kimberly. On May 30, 1995, Boyd and [Petitioner] argued, and he refused her request to leave her apartment and knocked a plate of food out of her hand. [Petitioner] then went outside and broke Boyd's window and her neighbor's window. When Boyd went outside, a confrontation ensued and [Petitioner] hit her in the jaw with his fist. Boyd hit him back, then ran into the house to get a knife for protection. When she came out toward him, [Petitioner] was holding a knife and "nicked" her nose with it. Boyd then called the police. Boyd ended her relationship with [Petitioner] soon after that, but it resumed about two years later.

On December 10, 1997, Boyd's son called the police after [Petitioner] broke some windows in Boyd's home and threw her Christmas tree out the window because he was upset that she had not cooked dinner. She told police that [Petitioner] hit her in the face with a set of dumbbells. However, at trial, she said that did not occur. Boyd continued her relationship with [Petitioner] until he went to prison.

<u>The Defense</u>

The defense theory was that [Petitioner] did not kill Kimberly, and that she did not intend to move to Sacramento without him.

[Petitioner]'s sister testified that [Petitioner] called her around midnight or 1:00 a.m. on the night of the murder. He was "hysterical" and crying. [Petitioner]'s brother-in-law also received a call from [Petitioner] at around that time, after which he went to Kimberly's apartment. [Petitioner] appeared upset.

Tapes of Jasmine's and Willie, Jr.'s, videotaped statements to Sergeants Lynch and Beetle the day after the murder were played for the jury. Jasmine said that the night before, [Petitioner] left twice to go to the store after Kimberly told him to buy newspapers to pack glasses, and when he returned from the store he helped Kimberly pack. She also said [Petitioner] did not wrestle with the children that evening. Willie, Jr., also told police that [Petitioner] and Kimberly were packing, and that [Petitioner] and Kimberly argued while Kimberly was talking on the phone and [Petitioner] hung up the phone. Willie, Jr., said that [Petitioner] did wrestle with him that evening.

On cross-examination, Lynch testified that based on his direct experience, it can take days, weeks, months or years for a child who is repressing or suppressing something to "open up" so the child may be more thoroughly interviewed. Lynch opined that the length of the delay depends on "the event."

A defense investigator testified that she attempted to interview Jefferson in jail, but Jefferson said he did not know [Petitioner] and did not want to talk to her.

(Resp't Ex. 6, Ct. of Appeal Op. at 1-9 (brackets added and footnotes in original)).

## **DISCUSSION**

I.    **Legal Standard**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was

United States District Court

For the Northern District of California

"adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining [the] jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)); see, e.g., DePetris v. Kuykendall, 239 F.3d 1057, 1061 (9th Cir. 2001) (exclusion of evidence was an unreasonable application of federal law and had a substantial and injurious effect on verdict).

**A.     Section 2254(d)(1)**

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States."  Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

7

United States District Court
For the Northern District of California

1

### 1. Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### 2. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that

8

**United States District Court**
For the Northern District of California

1  correctly identifies the controlling Supreme Court framework and applies it to the facts of a

2  prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529

3  U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of

4  § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

5           **3.     "Unreasonable Application"**

6          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

7  state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

8  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13.

9          "[A] federal habeas court may not issue the writ simply because that court concludes in its

10  independent judgment that the relevant state-court decision applied clearly established federal law

11  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; accord

12  Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application

13  of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v.

14  Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

15  "incorrect" application of law).

16          Evaluating whether a rule application was unreasonable requires considering the relevant

17  rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

18  more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664

19  (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record

20  that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

21          The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at 75-

22  76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging

23  the overruling of Van Tran on this point).  After Andrade,

24              [T]he writ may not issue simply because, in our determination, a state court's
                application of federal law was erroneous, clearly or otherwise.  While the
25              "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes
                a greater degree of deference to the state courts than [the Ninth Circuit] ha[s]
26              previously afforded them.

27  Id.  In examining whether the state court decision was unreasonable, the inquiry may require

28

9

1   analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th

2   Cir. 2003).

3       **B.      Sections 2254(d)(2), 2254(e)(1)**

4       A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim

5   "resulted in a decision that was based on an unreasonable determination of the facts in light of the

6   evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable

7   determination of the facts occurs where a state court fails to consider and weigh highly probative,

8   relevant evidence, central to a petitioner's claim, that was properly presented and made part of the

9   state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must

10  presume correct any determination of a factual issue made by a state court unless a petitioner rebuts

11  the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

12      Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or

13  situations in which the petitioner challenges a state court's fact-findings based entirely on the state

14  court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence

15  presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir.

16  2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and

17  2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-

18  finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The

19  intrinsic review requires federal courts to examine the state court's fact-finding process, not its

20  findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part

21  of the analysis begins by dressing the state court finding in a presumption of correctness under

22  § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-

23  finding may be overturned based on new evidence presented by a petitioner for the first time in

24  federal court only if such new evidence amounts to clear and convincing proof a state court finding

25  is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the

26  clear-and-convincing standard of proof only come into play once the state court's fact-findings

27  survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference

28

**United States District Court**
For the Northern District of California

implicit in the 'unreasonable determination' standard of section 2254(d)(2)." <u>Taylor</u>, 366 F.2d at

1000.  If constitutional error is found, habeas relief is warranted only if the error had a "'substantial

and injurious effect or influence in determining [the] jury's verdict." <u>Penry</u>, 532 U.S. at 795 (quoting

<u>Brecht</u>, 507 U.S. at 638).

## II.   **Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

either the fact or length of their confinement are required first to exhaust state judicial remedies,

either on direct appeal or through state collateral proceedings, by presenting the highest state court

available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not

explain the rationale of its decision, federal court review under § 2254(d) is of the last state court

opinion to reach the merits.  <u>Bains v. Cambra</u>, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000).  In this

case, the last state court opinion to address the merits of Petitioner's claim is the reasoned opinion of

the state appellate court.  It is undisputed that Petitioner exhausted his direct and collateral state

court remedies as to the claims raised in his petition.

## III.   **Legal Claims**

The petition raises sixteen claims:  (1) - (3) the evidence was insufficient to support a

conviction of premeditated and deliberate murder; (4) the trial court erred in admitting evidence of

prior acts of domestic violence; (5) the trial court erred in admitting inadmissible hearsay; (6) the

trial court erred by failing to give a jury instruction requested by the defense; (7) the trial court erred

by "prejudicially instructing the jury [that] the conscious disregard form of voluntary manslaughter

is a general intent crime"; (8) the trial court erred in instructing the jury with CALJIC No. 2.50.02;

(9) the trial court erred in admitting Officer Lynch's testimony regarding reporting delays by child

witnesses; (10) - (15) the trial court erred in admitting inconsistent and contradictory testimony from

Claudis Jefferson, Brenda Boyd, Ladonna Jackson, Robin Jackson, Willie Ray, Jr., and Jasmine

Price; and (16) cumulative error.  The Court deals with each claim below.

United States District Court

For the Northern District of California

IV.   **Claims Denied in Reasoned State Court Decision**

    A.   **Insufficiency of Evidence**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief.  See Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  See id. (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338; Miller v. Stagner, 757 F.2d 988, 992-93 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048, and cert. denied, 475 U.S. 1049 (1986); Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.), cert. denied, 469 U.S. 838 (1984).[6]

If confronted by a record that supports conflicting inferences, a federal habeas court must presume -- even if it does not affirmatively appear on the record -- that "the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S.

---

[6]  The Ninth Circuit has left open the question whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc); Bruce v. Terhune, 376 F.3d 950, 956-57 (9th Cir. 2004).  However, five other circuits have concluded that a sufficiency of the evidence claim presents a legal determination that must be evaluated through the AEDPA standard of review embodied in § 2254(d)(1), and no circuit has explicitly held that a state court's Jackson inquiry is exempt from AEDPA's standard of review.  Id. at 958-59 (O'Scannlain, J., concurring specially).

at 326.  A jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations.  See id. at 952 (credibility contest between victim alleging sexual molestation and petitioner vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); see also People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on victim's uncorroborated testimony).

The prosecution need not affirmatively rule out every hypothesis except that of guilt.  Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326).  The existence of some small doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an otherwise legitimate conviction.  See Taylor v. Stainer, 31 F.3d 907, 910 (9th Cir. 1994) (three hypotheses regarding petitioner's fingerprints which government failed to rebut unsupported by evidence and therefore insufficient to invalidate conviction).

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  Mere suspicion and speculation, however, cannot support logical inferences.  Id.

The state appellate court addressed Petitioner's insufficiency of evidence claim as follows:

> We first conclude that the evidence regarding the manner in which Kimberly was murdered was sufficient to support the jury's finding of premeditation and deliberation.  The pathologist testified that death from strangulation can take between one and five minutes, and a longer time is necessary if the strangulating pressure is interrupted and the victim can take some breaths.  The police opined that a struggle took place in Kimberly's bedroom.  Numerous fresh scratches covered [Petitioner]'s arms, and [Petitioner] told Jefferson that the scratches occurred while he was strangling Kimberly and she was trying to defend herself.  That Kimberly's hand was upraised and in a claw-like position further suggests she was trying to defend herself during the attack.  A scratch on Kimberly's chin may also have indicated a struggle.  In addition, the testimony of Jasmine and Willie, Jr., further supports the inference that the strangulation was prolonged, not immediate, occurring over minutes rather than seconds.  (See People v. Davis (1995) 10 Cal. 4th 463, 510 [defendant's strangling of victim for up to five minutes, among other things, demonstrated deliberate plan to kill her].)  Jasmine testified that she was awakened by a "thump" on the wall and then heard Kimberly say "stop."  Jasmine peeked into Kimberly's bedroom, saw [Petitioner] strangling her against the wall, then went back to her bedroom to wake up Willie, Jr.  After doing so, she and Willie, Jr., returned to Kimberly's bedroom and [Petitioner] was still in the process of strangling Kimberly.  Taken together, the jury could properly determine that after [Petitioner] began choking Kimberly, she verbally and then physically attempted to get him to stop, and

13

that [Petitioner] continued to strangle her to death despite her protests.  Thus, even if [Petitioner]'s conduct in pushing Kimberly up against the wall and choking her was an unreflective explosion of violence, his decision to continue the attack and choke her to death, despite her verbal and nonverbal protests, supports the conclusion that the strangulation was premeditated.

There was also evidence suggesting [Petitioner]'s motive behind the killing.  On the evening of the murder, Kimberly had finished packing and was planning to move to Sacramento in a few days with the children, without [Petitioner].  Although Kimberly and [Petitioner] had argued at other times during the month about her moving to Sacramento, the jury could reasonably infer that the intensity of [Petitioner]'s feelings that Kimberly was "trying to get away from [him] and he wasn't having none of that" increased when her packing was completed on the night of the murder.  Even if a motive is unreasonable or incomprehensible, a jury can reasonably infer the [Petitioner] harbored such motive and acted on it.  (People v. Pensinger (1991) 52 Cal. 3d 1210, 1238.)

[Petitioner] cites People v. Rowland (1982) 134 Cal. App. 3d 1 in support of the proposition that without more, strangulation alone is insufficient to show premeditation and deliberation.  We do not disagree with that proposition, but conclude that Rowland is distinguishable.  In Rowland there was minimal evidence of planning and no evidence of motive or manner of killing to support a finding of premeditation and deliberation.  (Id. at p. 9.)  In this case, there was strong evidence of the manner of killing as well as evidence of motive.

[Petitioner] cites People v. Bender (1945) 27 Cal. 2d 164 and People v. Hopper (1956) 145 Cal. App. 2d 180 for the proposition that evidence of past marital disputes is not substantial evidence of a preconceived motive at the time of the killing.  In Bender, the defendant strangled his wife and the strangulation was found to be a contributing factor in her death.[7]  (Id. at p. 170.)  Their eight-month married life had been marked by heavy drinking, violent quarrels, reconciliations, discussions of the wife's intention to have the marriage annulled, and their intentions to commit suicide.  (Id. at pp. 167-168.)  The court concluded that the evidence suggested eight months of violent marital disagreements which, after several hours of drunken quarreling, culminated in murder.  (Id. at p. 179.)  The court also concluded that there was no evidence of the defendant's motive at the time of the killing.  (Ibid.)  The court stated, "The picture suggests reasons for and the facts of quarreling between decedent and [the] defendant but leaves only to conjecture and surmise the conclusion that [the] defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.  Overwhelmingly opposed to such conjecture or surmise, and consistently evidenced by every circumstance is the rationale of a tempestuous quarrel, hot anger, and a violent killing."  (Id. at pp. 179-180.)  In addition to concluding that the jury had been erroneously instructed on the terms "deliberate" and "premeditate" and that the error was prejudicial, the court concluded that there was no substantial evidence of premeditation and deliberation.  (Id. at p. 186.)

Again, Bender is distinguishable.  In that case, there was only minimal discussion of

---

[7]  It could not be determined whether the two head wounds sustained by the victim resulted from something hitting her head or her head hitting some object.  (People v. Bender, supra, 27 Cal. 2d at p. 170.)

14

United States District Court

For the Northern District of California

1    the manner of the killing.  There was evidence of manual strangulation and head
2    injury, but the cause of the head injury was unknown.  There was no evidence
     regarding the length of time of the assault or the strangulation.  In this case, there was
3    evidence from which the jury could reasonably infer that the strangulation took
     minutes and was interrupted by Kimberly's verbal and physical attempts to defend
4    herself, during which [Petitioner] had time for reflection.  In addition, evidence of
     motive in this case was presented through the testimony of Jefferson, who said
5    [Petitioner] told him essentially that he could not accept Kimberly's moving to
     Sacramento without him, and evidence that the move was imminent.

6    For similar reasons, [Petitioner]'s reliance on <u>People v. Hopper</u>, <u>supra</u>, 145 Cal. App.
7    2d 180 is misplaced.  In that case the defendant killed his wife after 10 years of
     marriage during which the defendant's occasional threats and acts of violence against
8    his wife were interspersed by amicable relations.  (<u>Id.</u> at p. 190.)  The wife died from
     injuries resulting from a beating.  (<u>Id.</u> at pp. 183-184.)  Citing <u>Bender</u>, the court
9    concluded that there was no showing of the defendant's motive or intent to kill his
     wife at the time of the killing.  (<u>Hopper</u>, at pp. 186-189.)  The court concluded that
10   there was no evidence that the beating that resulted in the wife's death differed from
     those in the past, i.e., was the result of premeditation and deliberation.  (<u>Id.</u> at p. 190.)
11   The instant case is distinguishable because there was evidence of motive and there
     was evidence from which the jury could infer that the strangulation was interrupted
12   by Kimberly's attempts to defend herself, giving [Petitioner] the time and opportunity
     to reflect on his actions.
13
     In light of our determination that the record contains substantial evidence to support
14   the jury's findings of premeditation and deliberation, we reject [Petitioner]'s
     contention that his section 1118.1 motion was erroneously denied.
15
16   (Resp't Ex. 6 at 10-13 (brackets added and footnote in original).)

17        Viewing the evidence in the light most favorable to the prosecution, and resolving any

18   conflicting inferences in its favor, the Court finds that a rational trier of fact could have found the

19   essential elements of the crimes beyond a reasonable doubt.  <u>Payne</u>, 982 F.2d at 338.  That is, a

20   rational juror could have found that Petitioner was guilty of first degree murder based upon the ample

21   evidence reviewed by the state court above.

22        The state court's rejection of Petitioner's insufficiency of the evidence claim was not contrary

23   to, or an unreasonable application of, clearly established Supreme Court precedent.  <u>See</u> 28 U.S.C.

24   § 2254(d)(1).  Accordingly, this claim for habeas corpus relief is DENIED.

25        **B.**      **<u>Trial Court Erred in Admitting Evidence of Prior Acts of Domestic Violence</u>**

26        Petitioner claims that the admission of his prior uncharged acts of domestic violence under

27   Section 1109 of the California Evidence Code violated his right to due process.  He also contends

28   the trial court abused its discretion by admitting such evidence, which he argues should have been

excluded under Section 352 of the California Evidence Code.  The appellate court summarized the

factual basis for Petitioner's claim as follows:

> Prior to trial, the prosecutor moved pursuant to Evidence Code sections 1101 (evidence of other crimes to prove conduct) and 1109 to introduce evidence regarding the two prior instances of domestic violence in which [Petitioner] assaulted Boyd.  The prosecutor argued that the prior acts were preceded by [Petitioner] getting drunk and the victim trying to leave him, and were admissible to establish identity, motive and intent.  The trial court ruled admissible the prior domestic violence evidence regarding Boyd.  Prior to Boyd's testifying, the court gave the jury a limiting instruction pursuant to CALJIC No. 2.50.02 regarding the purposes for which the jury could consider evidence of prior instances of domestic violence.

(Resp't Ex. 6 at 13 (brackets added and footnotes omitted).)

Section 352 provides as follows:  "The court in its discretion may exclude evidence if its

probative value is substantially outweighed by the probability that its admission will (a) necessitate

undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the

issues, or of misleading the jury."  Cal. Evid. Code § 352.

Section 1101 of the Evidence Code provides as follows:

(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.

Id. § 1101.

Section 1109 of the Evidence Code permits the admission of evidence of the petitioner's

offenses involving domestic violence, subject to a balancing test of the evidence's probative value

against its prejudicial effect, in accordance with section 352.  Id. § 1109(a)(1).   Subsection (a)(1) of

section 1109 provides:

(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the

16

United States District Court

For the Northern District of California

defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.

Id.

The appellate court addressed Petitioner's argument as follows:

Although conceding that at least three courts of appeal have rejected due process challenges to Evidence Code section 1109, [Petitioner] contends that that section violates federal due process standards on its face and as applied to him.  In particular, he argues that admission of prior acts to show propensity to commit a crime and to permit a jury to convict upon such evidence deprives a criminal defendant of his right to due process and a fair trial.  In addition, he argues that as applied to him, Evidence Code section 1109 improperly reduced the prosecution's burden of proof, permitted conviction based solely upon character evidence and status and deprived him of a fair trial.  He asserts that the prior acts were so remote and dissimilar that they did not show a propensity to commit murder and prejudiced the jury's determination of the degree of the homicide.

Although the Supreme Court has not addressed the constitutionality of Evidence Code section 1109, it upheld the parallel provision of Evidence Code section 1108 (admission of prior sex offenses) against a due process challenge.  (See People v. Falsetta (1999) 21 Cal. 4th 903.)  [Petitioner]'s constitutional arguments regarding Evidence Code section 1109, subdivision (a)(1) have been rejected by various Courts of Appeal.  (See People v. Jennings (2000) 81 Cal. App. 4th 1301, 1310; People v. Hoover (2000) 77 Cal. App. 4th 1020, 1026-1029; People v. Johnson (2000) 77 Cal. App. 4th 410, 416-420.)  We adopt and apply the reasoning of those cases in rejecting [Petitioner]'s constitutional challenge.

Alternatively, [Petitioner] argues that the remoteness and dissimilarity of the prior domestic violence compelled its exclusion under Evidence Code section 352.  Evidence Code section 1109 requires that the introduction of prior domestic violence evidence be based on an evaluation pursuant to Evidence Code section 352 of whether the evidence is more probative than prejudicial.  The careful weighing of prejudice against probative value is necessary to protect a [Petitioner]'s due process right to a fundamentally fair trial. (People v. Jennings, supra, 81 Cal. App. 4th at p. 1314.)  A trial court's exercise of discretion under Evidence Code section 352 will not be overturned on appeal absent a manifest abuse of that discretion. (Jennings, at p. 1314.)

[Petitioner] asserts that the offenses against Boyd committed in 1995 and 1997 should have been precluded as remote.  It is noteworthy that Evidence Code section 1109, subdivision (e) has a remoteness provision stating that evidence of acts occurring more than 10 years before the charged offense is inadmissible, unless the court determines that admission of the evidence is in the interest of justice.  The offenses against Boyd were committed within five years of Kimberly's murder, and thus were not too remote in time, pursuant to either Evidence Code section 1009 [sic] subdivision (e) or case law, so as to diminish their probative value.  (See People v. Campbell (1994) 23 Cal. App. 4th 1488, 1497, fn. 14 [10-year-old conviction not too remote in time to be admissible].)

In reliance on People v. Harris, (1998) 60 Cal. App. 4th 727, 730, [Petitioner] also

17

United States District Court

For the Northern District of California

1   asserts that the prior acts against Boyd involved [Petitioner]'s use of weapons or fists
2   while drunk and should have been excluded because they are neither similar to the
    charged offense nor probative of a propensity to kill his wife.  [Petitioner] does not
3   dispute that the prior acts against Boyd were acts of domestic violence.

4   In Harris, the court determined that the trial court had erroneously admitted under
    Evidence Code section 1108, evidence of a 23-year-old prior, extremely violent
5   sexual assault in a case involving nonviolent sexual assaults against women whose
    lack of consent was based on their mental incapacity.  (People v. Harris, supra, 60
6   Cal. App. 4th at pp. 730-736.)  Harris concluded that the prior crimes evidence was
    remote, inflammatory, "nearly irrelevant," and likely to confuse and distract the jury.
7   (Id. at pp. 737-741.)

8   We conclude Harris is inapposite.  Here, the prior acts of domestic violence were
    significantly less inflammatory than the charged killing.  In addition, the prior
9   incidents were probative of [Petitioner]'s propensity for violence against female
    domestic partners.  Also, the Boyd incidents were relatively recent and her testimony
10  required less than 20 pages of trial transcript.  Finally, nothing about the prior acts of
    domestic violence against Boyd would likely confuse or distract the jury, and the
11  prior incidents were not likely to evoke an emotional bias against [Petitioner].

12  [Petitioner] has failed to establish that admission of the prior domestic violence
    incidents was an abuse of discretion.
13
    (Resp't Ex. 6 at 14-16 (brackets added).)
14
15          While no federal court has specifically ruled on the constitutionality of section 1108, several

16  circuit courts have upheld the use of propensity evidence under Rules 413 and 414 of the Federal

17  Rules of Evidence.  See, e.g., United States v. Castillo, 140 F.3d 874, 881 (10th Cir. 1998); United

18  States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998).

19          The Ninth Circuit has upheld the constitutionality of Rule 414, permitting admission of

20  evidence of similar crimes in child molestation cases.  See United States v. LeMay, 260 F.3d 1018,

21  1024-25 (9th Cir. 2001), cert. denied, 534 U.S. 1166 (2002).  The court held in LeMay that Rule 414

22  is not unconstitutional because it is limited in its function by Rule 403.  Id. at 1026-27.  Rule 403

23  directs judges to exclude any evidence submitted under Rule 414 that is more prejudicial than

24  probative.  Id. at 1027.  The court reasoned that this balancing process eliminates any due process

25  concerns from Rule 414, stating: "As long as the protections of Rule 403 remain in place to ensure

26  that potentially devastating evidence of little probative value will not reach the jury, the right to a

27  fair trial remains adequately safeguarded."  Id. at 1026.

28          The reasoning of LeMay applies equally to this case because the California rules are

18

**United States District Court**
For the Northern District of California

analogous to the federal rules.  Evidence that is admissible under sections 1109 is limited by section 352.  See Evid. Code §§ 1108(a), 1109(a)(1).  Section 352 parallels Rule 403 of the Federal Rules of Evidence because it permits a trial judge to exclude evidence when its probative value is substantially outweighed by its prejudicial effect.  See Evid. Code § 352.  As the California Supreme Court held in Falsetta, the requirement under section 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted under section 1109 will not infringe on the right to a fair trial guaranteed under the Due Process Clause.  21 Cal. 4th at 913.

Finally, the United States Supreme Court has never held that the admission of evidence of prior crimes violates the right to due process.  See Estelle v. McGuire, 502 U.S. 62, 75 & n.5 (1991) (declining to rule on the constitutionality of propensity evidence); Alberni v. McDaniel, 458 F.3d 860, 864-67 (9th Cir. 2006).  Because habeas relief may not be granted unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, see 28 U.S.C. § 2254, and there is no Supreme Court precedent that admission of propensity evidence violates due process, the decision of the appellate court cannot be said to have contradicted or unreasonably applied clearly established federal law in upholding the constitutionality of sections 1108 and 1109.  See Alberni, 458 F.3d at 866-67 (under AEDPA, habeas relief cannot be granted on claim Supreme Court has reserved); id. at 874-75 (although habeas relief may still be available after AEDPA on reserved issues, as to propensity evidence there is insufficient Supreme Court authority of any kind to clearly establish a due process right not to have such evidence admitted) (McKeown, J., concurring in part and dissenting in part).

The state court's decision regarding the admission of prior acts of domestic violence was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1).  Accordingly, this claim for habeas corpus relief is DENIED.

**C.   Inadmissible Hearsay**

Petitioner alleges that, under section 352 of the California Evidence Code, the court erred in admitting testimony by Robin Jackson, Kimberly's cousin, that a week before the murder, Kimberly said, "He's always trying to intimidate me."  (Resp't Ex. 6 at 10.)  As mentioned above, section 352

United States District Court
For the Northern District of California

allows the court to exclude evidence if its probative value "substantially outweighs" the probability

its admission will cause undue consumption of time or create "substantial danger" of undue

prejudice.  See Evid. Code § 352.

Section 1250 of the Evidence Code contains the state of mind exception to the hearsay rule

and provides as follows:

> (a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain the acts or conduct of the declarant.

Id. § 1250.

Section 1221 of the California Evidence Code provides the adoptive admissions exception to

the hearsay rule:

> Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.

Id. § 1221.

The appellate court summarized the factual basis for Petitioner's claim as follows:

> Prior to trial, the prosecution moved in limine to introduce this and five other hearsay statements by Kimberly under the state of mind exception to the hearsay rule (Evid. Code, § 1250) to show that at some point prior to her death, Kimberly was afraid of [Petitioner].  The prosecution argued that Kimberly's fearful state of mind was relevant to her intent to move to Sacramento, and, therefore, to the issues of identity, intent and motive.  [Petitioner] filed a written objection to the motion, arguing that the challenged statement was inadmissible hearsay, had no tendency to prove anything about Kimberly's state of mind regarding any material issue, and was unduly prejudicial and should be excluded under Evidence Code section 352.

> Although the record is not entirely clear, it appears that the court never made a definitive ruling regarding the admissibility of the challenged statement.  At the in limine hearing the court stated, "the statement allegedly attributed to [Petitioner] is that, 'He's always trying to intimidate me,' and in his response, 'If I'm going to kick your ass, I don't need to intimidate you to kick your ass, I'll just kick your ass,' I don't know if she can attribute that statement to [Petitioner] specifically or not, or just to anybody.  And that's a little too vague for me at this point.  [¶]  Before we get into that particular statement, I would want to have a 402 hearing about it and hear the circumstances.  [¶]  . . .  [¶]  So, this may not be the clearest ruling, but essentially I'm stating that you can introduce in your case-in-chief, [prosecutor], evidence of her state of mind about wanting to leave, because I think it does go to motive . . . .  [¶]

**United States District Court**
For the Northern District of California

> But all of the stuff she was in fear of the [Petitioner], unless I'm shown some specific case otherwise that matches the facts in this case, my ruling would be you can't use that in your case-in-chief; but if the defense introduces all of these letters [showing a positive relationship between [Petitioner] and Kimberly while he was in custody], then you can certainly in my ruling use them subject to a statement-by-statement ruling of the Court about what can be used."

> Thereafter, the court never made an express ruling on the admissibility of the challenged statement and [Petitioner] did not object when the prosecutor referred to the challenged statement in opening argument, or when it was adduced during Robin's testimony.

(Resp't Ex. 6 at 11 (brackets added and footnote omitted).)

Petitioner alleges that the "court erred prejudicially in admitting Kim's statement suggesting she feared [P]etitioner to show Kim's state of mind, denying [P]etitioner due process of law and fair trial."  (Pet. at 2.)

The appellate court found the evidence admissible as follows:

> We conclude that when Kimberly's statement is viewed in the context of a three-way conversation by her, Robin and [Petitioner], it falls within the adoptive admissions exception to the hearsay rule.  (Evid. Code, § 1221.)  "The adoptive admissions exception generally permits hearsay to be admitted against a party, when that party has adopted or agreed that a statement originally made by someone else is true."  (People v. Castille (2003) 108 Cal. App. 4th 469, 479, fns. omitted.)

> The two requirements for the introduction of an adoptive admission are: (1) the party must have knowledge of the content of another person's hearsay statement, and (2) having such knowledge, the party, by words or conduct, must have indicated his adoption of, or belief in, the truth of the hearsay statement.  (Id. at p. 480; accord, People v. Silva (1988) 45 Cal. 3d 604, 623.)  "The analytical basis for this exception is that the adopting party makes the statement his own by admitting its truth.  The statement or conduct of the adopting party thus expresses the same statement made by the declarant. [Citation.]"  (Castille, at p. 480.)  Here, Robin testified that after Kimberly told her, "He's always trying to intimidate me," Robin overheard [Petitioner] say, "I don't have to try to intimidate you. If I want to kick your ass, I'll just kick your ass."  [Petitioner's] statement clearly is an adoption by him of the truth of Kimberly's statement.

> We agree with the People that the challenged statement was relevant to refute the defense that [Petitioner] and Kimberly had a positive relationship and that they were both going to Sacramento and, therefore, he lacked a motive to kill her.  In addition, we reject [Petitioner's] assertion that the prejudicial effect of the statement outweighed its probative value in light of the written correspondence between [Petitioner] and Kimberly that reflected a positive relationship and testimony that, shortly before her murder, Kimberly was looking forward to [Petitioner's] release from prison and his staying with her and the children.

(Resp't Ex. 6 at 11-12 (brackets added).)

The appellate court found that Petitioner's failure to object to the statement at the time of

21

Robin's testimony constitutes waiver and precludes his claim on appeal.  After Petitioner filed a written motion challenging the admission of evidence that Kimberly feared Petitioner on the grounds that the evidence was unduly prejudicial and should be excluded, the court never made an express ruling on the admissibility of the challenged statement and Petitioner did not object when the prosecutor referred to the challenged statement in the opening argument.

Assuming there was no waiver, the appellate court concluded that when Kimberly's statement is viewed "in the context of a three-way conversation by her, Robin and [Petitioner], it falls within the adoptive admissions exception to the hearsay rule.  [Citation omitted.]"  (Id. at 12.)  During Robin and Kimberly's telephone conversation, Robin overheard Petitioner say, "I don't have to try to intimidate you. If I want to kick your ass, I'll just kick your ass."  (Id.)  Petitioner's statement is an adoption by him of the truth of Kimberly's statement that Petitioner "is always trying to intimidate me," thus the evidence falls within the adoptive admissions exception to the hearsay rule.

Petitioner has not shown that the state court's admission of evidence that Kimberly feared Petitioner violated any federal constitutional right or denied him a fundamentally fair trail.  The appellate court's rejection of his claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner's request for habeas relief on this claim is DENIED.

### D.   Erroneous Jury Instructions

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle, 502 U.S. at 71-72.  To obtain federal collateral relief for errors in a jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973).  "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (quoting Cupp, 414 U.S. at 146).  The instruction "may not be judged in artificial

22

isolation," but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).  In other words, the district court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire process.  See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the United States Constitution.  Estelle, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990).

A determination that there is a reasonable likelihood the jury has applied the challenged instructions in a way that violates the Constitution establishes only that a constitutional error has occurred.  Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If constitutional error is found, the Court also must determine the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief.  Id. (citing Brecht, 507 U.S. at 637).

### 1.    CALJIC Nos. 3.30 and 3.31

Petitioner claims the court erred by instructing the jury with CALJIC Nos. 3.30 and 3.31, which provide that the conscious-disregard-of-human-life form of voluntary manslaughter involves general intent.  He argues that notwithstanding the jury's finding of first degree murder, the erroneous instructions impacted the jury's consideration of malice, resulting in reversible constitutional error.

The appellate court summarized the factual background of this claim as follows:

> The court instructed the jury with the following version of CALJIC No. 3.30: "In the crime of Voluntary Manslaughter, a lesser offense to the crime of Murder . . . the law provides that every person who unlawfully kills another human being without malice aforethought, but with either: 1) an intent to kill or; 2) in conscious disregard for human life, is guilty of Voluntary Manslaughter.  *Where there is a conscious disregard for human life but not an intent to kill, there must exist a union or joint operation of act or conduct and general criminal intent.*  Also, in the lesser crime of Involuntary Manslaughter . . . only general criminal intent need be shown.  [¶] General intent does not require an intent to violate the law.  When a person intentionally does that which the law declares to be a crime, he is acting with general

criminal intent, even though he may not know that his act or conduct is unlawful."
(Italics added.)

The court also instructed with the following modified version of CALJIC No. 3.31:
"In the crime charged by the Information, Murder, . . . and in the lesser crime of
Voluntary Manslaughter . . . where the evidence proves an intent to kill without
malice aforethought, there must exist a union or joint operation of act or conduct and
a certain mental state or specific intent in the mind of the perpetrator.  Unless this
mental state or specific intent exists the crime to which it relates is not committed.
Voluntary Manslaughter may also be shown by proof of an unlawful killing in
conscious disregard for human life without the necessity of showing an intent to kill.
*Under this circumstance, only general criminal intent, as defined elsewhere in these
instructions applies.*  [¶]  The mental state or specific intent required is included in
the definition of the crimes set forth elsewhere in these instructions.  [¶]  In the crime
of Murder, the necessary mental state is malice aforethought.  [¶]  And the lesser
crime of Voluntary Manslaughter, based on a theory of 'intent to kill' rather than
'conscious disregard for human life,['] requires the specific intent to kill."  (Italics
added.)

[Petitioner] cites no authority on the issue of whether voluntary manslaughter based
on conscious disregard is a general or specific intent crime.  Instead, he argues that
the voluntary manslaughter conscious disregard standard is analogous to second
degree implied malice murder, which is "closely akin to specific intent . . . [requiring]
more than the intentional doing of an act . . . . "  Thus, he asserts that the court erred
in instructing the jury that voluntary manslaughter based on conscious disregard is
proved by the intentional commission of a proscribed act, and in excluding conscious
disregard voluntary manslaughter from the ambit of CALJIC No. 3.31.

[Petitioner] argues that the court's erroneous description of conscious disregard as a
general intent mental state "carried over directly" to the jury's consideration of malice
for purposes of murder.  "Jurors would quite logically take the general intent standard
to apply to the identical definition of implied malice given in connection with murder,
not just manslaughter," and could have convicted him of murder based on an
erroneous understanding that first degree murder is a general intent crime.  He further
argues that there is a reasonable probability that the jurors found he premeditated "a
'conscious disregard' killing by choking his wife for too long[,]" posing an "undue
risk of death[,]" without finding a specific intent to kill.  [Petitioner] also argues that
counsel's arguments during closing arguments contributed to the jury's being misled
by the erroneous instructions.

(Resp't Ex. 6 at 16 (brackets added and italics in original).)

Petitioner's argument was rejected by the appellate court as follows:

We conclude that even assuming the trial court erred in referring to voluntary
manslaughter based on conscious disregard as a general intent crime, its instructions
identified the necessary elements of first and second degree murder, and voluntary
manslaughter.  The jury was also properly instructed on the definitions of express and
implied malice aforethought, and the provocation necessary to reduce murder to
manslaughter.

Pursuant to the court's instructions, the jury could not convict [Petitioner] of first
degree murder without finding that he had an express intent to kill and that at the time
of the killing [Petitioner] was not acting under the influence of a sudden quarrel or

24

heat of passion.  Assuming the trial court's classification of conscious disregard voluntary manslaughter as involving general intent was misleading, it could not have distracted the jury from the central questions of whether he harbored an express intent to kill and was acting under the heat of passion or sudden quarrel.

We also reject [Petitioner's] assertion that counsel's arguments during closing arguments contributed to the jury's being misled by the erroneous instructions.  The jurors were expressly instructed that if there was any confusion about the instructions on the law, they were to follow the court's instructions.  In addition, both counsel argued that first degree murder required premeditation and deliberation.

We conclude that any error in the court's instructions which characterized the conscious disregard voluntary manslaughter mental state as one of general intent was harmless beyond a reasonable doubt.  (<u>Chapman v. California</u> (1967) 386 U.S. 18.)

(<u>Id.</u> at 16-17 (brackets added).)

Assuming the trial court erred in referring to voluntary manslaughter based on conscious disregard as a general intent crime, Petitioner has not shown that this error amounted to a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.  The appellate court found that the jury instructions identified the necessary elements of first and second degree murder, voluntary manslaughter, express and implied malice aforethought and the provocation necessary to reduce murder to manslaughter.  In order to convict Petitioner of first degree murder, the jury must have found that he had an express intent to kill and that at the time of the killing Petitioner was not acting under the influence of a sudden quarrel or heat of passion.  The appellate court noted, "[a]ssuming the trial court's classification of conscious disregard voluntary manslaughter as involving general intent was misleading, it could not have distracted the jury from the central questions of whether [Petitioner] harbored an express intent to kill and was acting under the heat of passion or sudden quarrel."  (Resp't Ex. 6 at 17.)  The appellate court's rejection of his claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner's request for habeas relief on this claim is DENIED.

**2.     CALJIC No. 2.50.02**

Petitioner also argues his due process rights were violated by the trial court's reading of the 2000 version of CALJIC No. 2.50.02 because it misled the jury.  Pursuant to CALJIC No. 2.50.02

United States District Court

For the Northern District of California

25

1   (2000 rev.), the jury was instructed:

2       Evidence has been introduced for the purpose of showing that the defendant engaged
        in an offense involving domestic violence other than that charged in the case.  [¶]
3       . . .  [¶]  If you find by a preponderance of the evidence that the defendant committed
        a prior offense involving domestic violence, you may, but are not required to, infer
4       that the defendant had a disposition to commit another offense involving domestic
        violence.  If you find that the defendant had this disposition, you may, but are not
5       required to, infer that he was likely to commit and did commit the crime of which he
        is accused.  [¶]  However, if you find by a preponderance of the evidence that the
6       defendant committed a prior crime or crimes involving domestic violence, that is not
        sufficient by itself to prove beyond a reasonable doubt that he committed the charged
7       offense.  If you determine an inference properly can be drawn from this evidence, this
        inference is simply one item for you to consider, along with all other evidence in
8       determining whether the defendant has been proved guilty beyond a reasonable doubt
        of the charged crime.  [¶]  Unless you are otherwise instructed, you must not consider
9       this evidence for any other purpose.

10  (Resp't Ex. 6 at 17.)

11      Petitioner argues that the trial court's reading of the 2000 revised version of CALJIC No.

12  2.50.02 deprived him of his due process rights because the instruction "den[ied] Petitioner due

13  process of law and a fair trial and his state and federal Constitutional rights to a jury determination

14  of all issues beyond a reasonable doubt."  (Pet. at 6.)  Furthermore, Petitioner argues that CALJIC

15  No. 2.50.02 "permits an ultimate finding of guilt based upon prior conduct proven only by a

16  preponderance of the evidence."  (Id.)

17      The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove

18  every element charged in a criminal offense beyond a reasonable doubt.  In re Winship, 397 U.S.

19  358, 364 (1970).  This principle prohibits the use of evidentiary presumptions in a jury charge that

20  relieve the State of its burden of proof beyond a reasonable doubt.  See Yates v. Evatt, 500 U.S. 391,

21  400-03 (1991).  The State may adopt a rule that makes it easier for it to meet the requirement of

22  proof beyond a reasonable doubt, so long as the rule does not shift or reduce the burden of proof or

23  otherwise violate a principle of fairness contained in the Due Process Clause.  See Montana v.

24  Egelhoff, 518 U.S. 37, 54-55 (1996) (due process not violated by a rule excluding intoxication as

25  evidence to refute mens rea even though the rule made it easier for the State to prove mens rea

26  beyond a reasonable doubt).

27      The appellate court denied Petitioner's claim, stating:

28

26

[Petitioner] concedes that our Supreme Court, in People [v.] Reliford (2003) 29 Cal. 4th 1007, upheld substantially similar language against constitutional challenge. However, for purposes of exhaustion of state remedies in the event of federal postconviction review, he argues the instruction violates federal due process and jury trial standards in that it permitted the jury to find a defendant guilty of the charged offense without the prosecution having to prove the elements of the offense beyond a reasonable doubt and conflicts with the general burden of proof instruction given the jury in CALJIC [No.] 2.01.

Reliford involved the 1999 version of CALJIC No. 2.50.01, an instruction related to evidence of prior sex offenses that contains language nearly identical to the challenged language in CALJIC No. 2.50.02. (People v. Reliford, supra, 29 Cal. 4th at pp. 1011-1012.) In rejecting the lesser burden of proof argument, the Supreme Court stated, "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof. Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior . . . offense . . . . The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' [Citations.]" (Id. at p. 1016.)

The possibility of the jury being confused by a conflict between CALJIC No. 2.50.02 and CALJIC No. 2.01, was also resolved by Reliford, which rejected the argument that CALJIC No. 2.50.01 is "too complicated" for jurors to apply. (People v. Reliford, supra, 29 Cal. 4th at p. 1016 ["This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial . . . . As we do in each of those circumstances, we will presume here that jurors can grasp their duty -- as stated in the instructions -- to apply the preponderance- of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable doubt standard for all other determinations."].)

Given the Supreme Court's rejection of a similar instructional challenge, we reject [Petitioner]'s constitutional challenge to CALJIC No. 2.50.02.

(Resp't Ex. 6 at 17-18 (brackets added).)

The appellate court's decision was not contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). The United States Supreme Court has made clear that "instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions" and the trial record. United States v. Jones, 527 U.S. 373, 391 (1991).

The instructions used at Petitioner's trial were unlike those determined to be constitutionally infirm in Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004). In Gibson, the State introduced evidence of the [Petitioner]'s brutal, uncharged acts of sexual assault and domestic violence to help prove charges of rape and child molestation. Id. at 817. The jury was instructed with the 1996 version of

27

United States District Court

For the Northern District of California

CALJIC No. 2.50.01, which did not caution the jury that the inference it could draw from the prior offense was not enough to prove guilt of the charged crime beyond a reasonable doubt. Id. at 817-18. The problem was compounded by the use of a modified version of CALJIC No. 2.50.1, which used the preponderance of the evidence standard as the burden of proof for prior sexual offenses. Id. at 822. The "interplay of the two instructions allowed the jury to find that [the defendant] committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the charged acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." Id. (emphasis in original). The Gibson instructions, carefully followed by the jury, would allow conviction based on a finding of the preponderance of the evidence. See id.

The instructions read at Petitioner's trial were not the same as the those used in Gibson and did not permit a conviction upon less that proof beyond a reasonable doubt. The jury was instructed with the 2000 revised version of CALJIC No. 2.50.02, which added these paragraphs:

> However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime. [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

(Resp't Ex. 6 at 17.)

Given the trial court's explicit warning against confusing the lesser standard of proof for prior misconduct with the required higher standard of proof for the charged crime, the state court reasonably found no likelihood that the jury applied the challenged instructions to convict Petitioner based on a preponderance of evidence or any standard below proof beyond a reasonable doubt.

Because the appellate court's rejection of Petitioner's challenge to CALJIC No. 2.50.02 was not contrary to or an unreasonable application of clearly established federal law, this claim for habeas relief is DENIED.

**E.   Trial Court Erred in Admitting Officer Lynch's Testimony Regarding Reporting Delays by Child Witnesses**

28

Petitioner alleges that Officer Lynch's testimony was improperly admitted over defense counsel's objection that Officer Lynch was not qualified to offer an opinion as an expert regarding the typical length of time it takes for child witnesses to open up and give a more thorough interview.

The appellate court summarized the factual background of this claim as follows:

At trial [Petitioner] called Lynch to authenticate tape-recorded statements he and Beetle took of Jasmine the day after the murder.  The taped statements were offered to impeach Jasmine's trial testimony.  On cross-examination Lynch testified to his police officer training and experience as it relates to interviewing and talking to children.  Lynch said in the three years he worked in the juvenile division investigating sex crimes, he had interviewed at least 100 children as victims, witnesses and suspects "in various types of crimes."  Lynch then described Jasmine's demeanor during his interview of her.  Lynch stated that Jasmine's "abrupt and cursory" answers to his questions suggested she was "overwhelmed by this whole event."  Lynch decided not to "grill a small child, . . . especially when [he] wasn't convinced she was giving [him] particularly honest answers."  Lynch said that in his experience it was very common that children are interviewed more than once, and that it does not mean that the children are being dishonest.  Instead, they are "confused by what happened," "traumatized," or a relative may have "frightened them into silence."  Lynch said that based on his training and experience, many times "as time goes on" a child will "become more forthright and start being more willing to talk about what happened."

 When the prosecutor asked Lynch, "In your experience, how long of a period does it take for a child to be --" the following colloquy ensued:

"[Defense Counsel]: Well, I am going to object to this now.  We are far afield.  It's not relevant or responsive to the direct exam.

"The Court: I'm assuming that you are asking the question based on his experience working with children?

"[The Prosecutor]: Yes.

"The Court: I will allow it . . . .  It's an opinion by this person.  [¶]  . . . I think he has the qualifications to give such an opinion . . . .

"[Defense Counsel]: Psychological opinion, he has been qualified in that regard?

"The Court: I don't think he asked about a psychological opinion.  [¶]  Well, as I understood his question, is there some period of time that he can talk about before children do become -- if in fact that are repressing or suppressing something -- is there a time that he has seen based on his experience that kids open up more?

"[The Prosecutor]: Correct.

"The Court: If that's the question, I will allow, since it's mine."

Thereafter, Lynch testified that depending on the child and the nature of the event, it

can take days, weeks, months or years for a child to give a more thorough interview.

(Resp't Ex. 6 at 13 (brackets added)).

Petitioner's argument was rejected by the appellate court as follows:

The People argue the claim is waived because defense counsel did not object to Lynch's testimony on that ground. We agree. In order to preserve an evidentiary objection on appeal, a party must state it in a timely fashion and it must be accompanied by a reasonably definite statement of grounds. (Evid. Code, § 353, subd. (a).) "'Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence.' [Citation.]" (People v. Boyette (2002) 29 Cal. 4th 381, 424.)

Here, defense counsel objected to Lynch's testimony regarding his experience with the amount of time that children delay providing a thorough interview on the grounds that it was not relevant, not responsive to the direct examination, and Lynch was not qualified to render psychological testimony. The prosecutor's question, and Lynch's response to it, focused solely on Lynch's experience interviewing children. In essence, the question asked, based on the approximately 100 children Lynch had interviewed, how much time generally elapses between the child's first interview with police and a later thorough interview. Neither the question nor Lynch's answer involved psychological testimony and defense counsel never objected to Lynch's qualification to testify regarding his own experience. The asserted foundational defects [Petitioner] now raises on appeal could have, but were not raised below. Consequently, the issue is waived.

Assuming the issue is not waived, it may well be that the court erred in admitting Lynch's opinion. Pursuant to Evidence Code section 801, subdivision (a), an expert's opinion must relate to a subject matter that is sufficiently beyond common experience that it assists the trier of fact. At most, Lynch's testimony conveys that in his experience, some children are more forthcoming after being reinterviewed days, months or years after their initial interview. This does not appear to be matter that is "beyond common experience."

In any event, Kimberly's cousin, LaDonna, testified extensively regarding Jasmine and Willie, Jr.'s, psychological condition when they came to stay with her after their mother's murder. According to LaDonna, for a year after the murder, the children cried, clung to LaDonna, "had fits," and "wouldn't talk." LaDonna also said that during that year, the children were not able to and did not talk about what they may have seen or heard on the night of the murder. LaDonna said during that year she did not ask the children what they saw or heard that night because she did not want to "hurt them." LaDonna did enroll the children in weekly therapy sessions with a psychiatrist. LaDonna said that at some point more than a year after the murder, the children were finally able to talk about what happened that night. Lynch's opinion added little to LaDonna's extensive testimony regarding the children's psychological condition and delay in talking about the night of the murder. Thus, we conclude that any error in admitting Lynch's testimony is harmless. (People v. Watson (1956) 46 Cal. 2d 818, 836.)

(Id. at 13-14 (brackets added)).

30

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. See id. (citing Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990. If there are no permissible inferences that a jury may draw from the evidence then its admission violates due process. See Jammal, 926 F.2d at 920.

In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht. That is, the petitioner must show that the error had "'a substantial and injurious effect' on the verdict.'" Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

Petitioner was not denied a fundamentally fair trial guaranteed by due process by the admission of Officer Lynch's testimony regarding child witnesses. See Henry, 197 F.3d at 1031. The appellate court found that Petitioner never objected to Officer Lynch's qualification to testify regarding his own experience, and, consequently, the issue of whether Officer Lynch's testimony was improperly admitted over defense counsel's objection was waived. Assuming the issue was not waived and the trial court erred in admitting Officer Lynch's opinion, the appellate court found that Officer Lynch's opinion added little to LaDonna's extensive testimony regarding the children and their delay in speaking about the night of the murder. Even if Officer Lynch's testimony was

United States District Court

For the Northern District of California

admitted in error, the appellate court determined that such an error by the trial court was harmless. In light of LaDonna's extensive testimony, Petitioner has failed to show that the error in admitting Officer Lynch's testimony had "'a substantial and injurious effect' on the verdict.'" Dillard, 244 F.3d at 767 n.7 (quoting Brecht, 507 U.S. at 623).

The state court's rejection of this claim was not contrary to, nor an objectively unreasonable application of, Supreme Court precedent. See 28 U.S.C. § 2254(d). Petitioner's claim for habeas relief is DENIED.

**F.     Cumulative Error**

Petitioner claims that the cumulative effect of the court's errors requires reversal of the judgment.   The appellate court summarized petitioner's cumulative error claim as follows:

> . . . [Petitioner] contends that the cumulative effect of the court's errors requires reversal of the judgment.  Based on our review of the entire record, [Petitioner's] contention fails.  We identified one arguable evidentiary error and one arguable instructional error, both of which we considered harmless. [Petitioner] was entitled to a trial "in which his guilt or innocence was fairly adjudicated."  (People v. Hill (1998) 17 Cal. 4th 800, 844.)  He received such a trial.  Therefore, reversal is not warranted.

(Resp't Ex. 6 at 18 (brackets added)).

Petitioner cites no Supreme Court precedent, and the Court is aware of none, providing that the cumulative effect of numerous alleged errors, no one of which is of constitutional dimension, may violate a defendant's due process right to a fair trial.  The Supreme Court has, however, long recognized that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-509 (1983).  As explained above, AEDPA mandates that habeas relief may only be granted if the state courts have acted contrary to or have unreasonably applied federal law as determined by the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 412 (2000) ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence.").  In the absence of Supreme Court precedent recognizing a claim of "cumulative error," therefore, habeas relief cannot be granted.  In any event, to the extent that such a claim has

32

**United States District Court**
For the Northern District of California

been recognized by the Ninth Circuit, where there is no single constitutional error there can be no cumulative error that rises to the level of a due process violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v. Roe, 182 F.23d 699, 704 (9th Cir. 1999).

Petitioner cannot establish that the state court acted contrary to or unreasonably applied clearly established federal law as determined by the Supreme Court because the Supreme Court has never recognized a cumulative error claim. Further, even if such a claim did have a basis in Supreme Court precedent, it would fail here because there has been no constitutional error and thus no errors which could accumulate into a due process violation. Petitioner has failed to establish that the appellate court's determination was contrary to, or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d). Accordingly, this claim for habeas relief is DENIED.

## V. Claims Denied Summarily by State Court

Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. See Himes, 336 F.3d at 853; accord Lambert, 393 F.3d at 970 n.16. The federal court need not otherwise defer to the state court decision: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." Greene, 288 F.3d at 1089. Nonetheless, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).

United States District Court

For the Northern District of California

**A.      Trial Court Erred by Failing to Give Jury Instruction Requested by Defense**

**1.      Background**

Petitioner claims that the trial court prejudicially erred by failing to instruct the jury with a defense-requested jury instruction -- CALJIC No. 2.21.2.  According to Petitioner, the jury needed to be instructed that "false in one thing" meant "false in everything."  (Pet. at 4.)  He notes, "The [d]octrine means that if [a] testimony of a witness on a material issue is willfully false and given with an intention to deceive, the jury may disregard all of the witnesses testimony."  (Id.)

**2.      Applicable Federal Law**

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  See id.  Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d 734, 745 (1995).  Thus, an examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory.  See United States v. Tsinnijinnie, 601 F. 2d 1035, 1040 (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d at 475-76 (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  "[T]he significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given."  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156).

**3.      Analysis**

The record shows that when the defense requested CALJIC No. 2.21.2, "WITNESS

34

WILLFULLY FALSE," it was in fact given by the trial court as follows:

> A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

CT 331. Therefore, Petitioner's claim that his due process rights were violated because this instruction was not given is factually meritless. As such, the state court's rejection of Petitioner's claim that the court failed to give the requested jury instruction was not objectively unreasonable. See Himes, 336 F.3d at 853. Accordingly, this claim for habeas corpus relief is DENIED.

### B. Trial Court Erred in Admitting Inconsistent and Contradictory Testimonies of Claudis Jefferson, Brenda Boyd, LaDonna Jackson, Robin Jackson, Willie Ray, Jr. and Jasmine Price

Petitioner claims that admission of the "inconsistent and contradictory testimony" of Claudis Jefferson, Brenda Boyd, LaDonna Jackson, Robin Jackson, Willie Ray, Jr., and Jasmine Price violated his right to due process. (Pet. at 5-10.)

#### 1. Jailhouse Informant Claudis Jefferson's Testimony

Petitioner alleges that a "toxicology report for the petitioner, contradicts [Jefferson's] sworn testimony that the petitioner and Kim used and argued over cocaine [the night of the murder], further demonstrating [Jefferson's] many lies." (Id. at 6.) Petitioner also claims that Jefferson "testified under oath that he did not see the petitioner's police report which contradicts his taped statements to sergeant Ron Jones." (Id. at 5-6.)

Jefferson was asked if Petitioner told him about why he had killed her. RT 754. Jefferson testified that Petitioner told him that he used Kimberly's money to buy drugs, and when he returned home, Kimberly was upset about Petitioner using her money to buy drugs and then tried to leave him. RT 755. The record shows that there was no objection to this testimony at trial. Petitioner's failure to object to the statement at the time of Jefferson's testimony precludes his claim on appeal. California Evidence Code § 353 precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

1   Even if this claim were not waived, the testimony is admissible as a party admission.

2   "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the

3   declarant in an action to which he is a party in either his individual or representative capacity,

4   regardless of whether the statement was made in his individual or representative capacity."  Evid.

5   Code § 1220.  Therefore, the trial court did not err in admitting Jefferson's testimony of Petitioner's

6   versions of the events of the night of the crime, and thus there was no violation of Petitioner's due

7   process rights.

8   Petitioner also alleges that Jefferson told Sergeant Jones in a taped interview that Petitioner

9   "showed him a copy of his police report so that he could have more information to help the

10   petitioner with his case, which would explain [Jefferson's] source of information that he used to

11   concoct a story to use against the petitioner."  (Pet. at 5.)  Any confusion about whether Jefferson

12   saw a police report of the crime was clarified by his testimony in court.  Jefferson testified that he

13   never saw the police report of the crime.  RT 792-795.  Jefferson further testified that when he was

14   interviewed by police, he incorrectly referred to a two-page "Morrissey report"[8] as the police report.

15   RT 794.  Therefore, the Court finds the admission of Jefferson's alleged inconsistent testimony did

16   not violate Petitioner's due process rights.

17

18   **2.     Brenda Boyd's Testimony**

19   Petitioner alleges the state court "erred prejudicially in admitting Brenda Boyd's inconsistent

20   and contradictory testimony . . . [including] her statement that she gave false statements in a police

21   report that she filed against the Petitioner, denying Petitioner due process of law and a fair trial."

22   (Pet. at 6.)

23   Boyd testified about her relationship with Petitioner and also about two incidents in which

24   the police had to be called because of arguments between them.  RT 196-206.  During the first

25   incident, on May 30, 1995, Petitioner punched Boyd in the eye and "nicked" her nose with a knife.

26

27

28   _____

[8] A "Morrissey report" is a two-page probation report.

RT 197, 200.  Boyd told a police officer at the time of the second incident, on December 10, 1997, that Petitioner hit her in the face with a set of dumbbells.  RT 204.  When the prosecutor impeached Boyd with her statements given to police at the time of the second incident, Boyd testified that the facts she reported to the police did not really happen.  RT 203-204.

First, the record shows that defense counsel did not object to the impeachment of Boyd, and thus Petitioner's claim is waived.  Furthermore, impeachment with a prior inconsistent statement is admissible pursuant to California Evidence Code § 1235.  "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  Evid. Code § 1235.

Even if the trial court erred in admitting Boyd's allegedly inconsistent testimony, the Court must find that such an error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  In the present case, there is overwhelming evidence against Petitioner, and Boyd's testimony is not an essential element to this case.  When police found Kimberly's body, her hand was semi-closed in a claw-like position and there were two pinch-like marks under the left side of her chin which appeared fresh.  Detective Jones with the violent crimes unit opined that a struggle had taken place because they found Kimberly's hair extensions lying on the floor and an overturned lamp.  When police arrived at the crime scene, Petitioner was present at the scene with a fresh mark on his chest at the neckline of his shirt, and photos taken of Petitioner later that afternoon revealed fresh scratches on his upper arms and forearms.  Forensic serological testing of material recovered from Kimberly's fingernail clippings was consistent with Petitioner's genetic profile.  In addition, the jury heard testimony from Kimberly's children that they both saw Petitioner choking Kimberly, testimony from Jefferson that Petitioner told him that he choked Kimberly to death, and testimony from Ladonna Jackson as well as Robin Jackson that Kimberly was afraid of Petitioner.  Thus, even if Boyd's testimony were inconsistent, the abundance of evidence based on a review of the record shows ample support for the jury's first-degree murder verdict.  Therefore, the Court finds Petitioner fails to demonstrate that the admission of Boyd's

United States District Court

For the Northern District of California

1    allegedly inconsistent testimony violated his due process rights.

2              **3.    Ladonna Jackson's Testimony**

3              Petitioner alleges the state court "erred prejudicially in admitting Ladonna Jackson's

4    inconsistent and contradictory testimony . . . [including] statements that Kim called her twice in the

5    year 2000, and on the day before she died, telling her that she was going to move without the

6    [P]etitioner on [S]aturday, and that Kim sounded fearful and couldn't speak to express herself in her

7    own home."  (Pet. at 6.)

8

9              Petitioner claims Ladonna's testimony is false because Kimberly's home telephone records do

10   not evidence any phone calls made to Ladonna's phone number.  Defense counsel raised the issue

11   during the cross-examination of Sergeant Jones, chief investigating officer in this case who secured

12   Kimberly's home telephone records.  RT 721.  When asked if Kimberly made any phone calls to

13   Ladonna's home between January 9, 2000 and the death of Kimberly, Sergeant Jones stated that he

14   found no record of phone calls being made from Kimberly's home telephone to Ladonna's home.  RT

15   724.  The discrepancy between Ladonna's testimony and the telephone records was also stated in

16   closing arguments by Petitioner's counsel.  RT 1095-1097.  Because Petitioner's counsel highlighted

17   the discrepancy to the jury in his closing, the Court finds that Petitioner's due process rights were not

18   violated by Ladonna's allegedly inconsistent testimony.

19

20             **4.    Robin Jackson's Testimony**

21             Petitioner alleges the court erred prejudicially in admitting Robin Jackson's contradictory and

22   inconsistent testimony that Kimberly called her about a week before she died and that Kimberly

23   said, Petitioner is "always trying to intimidate me."  (Pet. at 7.)  Petitioner relies on the same

24   telephone records mentioned above to alleged that Robin's testimony about phone calls between her

25   and Kimberly was also erroneously admitted because there is no record of telephone calls made from

26   Kimberly's home telephone to Robin's home.   (Id.)  Petitioner's counsel raised the issue of the

27   telephone records to the jury in his closing in order to highlight the discrepancy between the

28   testimony of Robin Jackson and the telephone records.  RT 1096.  Therefore, the Court finds the

admission of Robin's allegedly inconsistent testimony did not violate Petitioner's due process rights.

### 5.   Willie Ray, Jr.'s Testimony

Petitioner alleges the court erred prejudicially in admitting Willie Jr.'s inconsistent and contradictory testimony, including "statements that Jasmine woke him up and they went to the living room and saw their dad standing behind their mom with one arm around her neck choking her to death." (Pet. at 7-8.)   Petitioner claims that Willie Jr.'s testimony at trial, that he saw Petitioner choking Kimberly the night of the murder, contradicted testimony Willie Jr. gave at the preliminary hearing, that he was sleeping and did not see nor hear anything the night of the murder.  (Pet. at 8.) Petitioner also claims that Willie Jr.'s testimony that he saw Petitioner choking Kimberly in the living room contradicts Jasmine's testimony that she woke up Willie Jr. and they both saw Petitioner choking Kimberly in Kimberly's bedroom.  (Id.)  Petitioner alleges, "[i]t's impossible for Kim to have been choked to death in two different rooms and two different styles of choking with Jasmine and [Willie Jr.] standing side by side watching at the same time." (Pet. at 8-9.)

The record confirms that Willie Jr. testified differently at the preliminary hearing and at trial about what he had witnessed the night of the murder.  RT 312-317.  During closing arguments, Petitioner's counsel highlighted for the jury the discrepancies in Willie Jr.'s testimony to discredit him.  He pointed out that Willie Jr. "even at five years old . . . knows his mother's bedroom from the living room," and that Jasmine and Willie Jr. were "coached and prepped." RT 1098.  Therefore, the Court finds Petitioner fails to demonstrate that the admission of Willie Jr.'s allegedly inconsistent testimony resulted in a violation of Petitioner's due process rights.

### 6.   Jasmine Price's Testimony

Petitioner alleges the court erred in admitting Jasmine Price's inconsistent and contradictory testimony, especially "statements that she was awaken by thumping on the wall and she and [Willie Jr.] saw [Petitioner] standing in front of [Kimberly] with both arms outstretched and both hands around her neck, choking her to death in [Kimberly's] bedroom."  (Pet. at 9.)  Petitioner states that

United States District Court

For the Northern District of California

on three separate occasions, Jasmine told "police that on the night of Kim's death, she was sleeping and didn't see nor hear anything." (Id.) At the preliminary hearing, Jasmine's testimony was that she was "awaken by her mom and dad arguing about the move to Sacramento and when she peaked [sic] into their bedroom, she saw her dad with his hands on her mom's neck, strangling her. After witnessing her mom's death, she went to her bedroom and went back to sleep and wasn't awaken again until she heard police walkie-talkies." (Id.)

Petitioner argues that Jasmine's testimony at trial differed from the testimony she gave at the preliminary hearing and from the statements she gave to the police on several different occasions. On cross-examination, Jasmine acknowledged that she had twice given tape-recorded statements to police, but had not told police about witnessing the murder. RT 358. Jasmine admitted that she had not told anybody about what she had seen until the police came for a third interview about one-and-one-half years after the murder. RT 359. Jasmine also admitted that she had not been truthful when she had first spoken to police about what happened on the night of the murder. RT 369. Jasmine did not remember testifying at the preliminary hearing that she had not heard any noises coming from her mother's bedroom (RT 383), that she thought Petitioner was coming to Sacramento with the rest of the family (RT 390), or that she did not tell police what happened because she feared Petitioner was going to return and "maybe kill us." RT 398.

As he did with Willie Jr.'s testimony, defense counsel highlighted for the jury the discrepancies in Jasmine's trial testimony, her statements to police and her preliminary hearing testimony during closing argument in order to discredit her. RT 1098-1107. Therefore, the Court finds that the admission of Jasmine's allegedly inconsistent testimony did not violate Petitioner's due process rights.

### 7.   **Summary**

Accordingly, this claim for habeas relief fails because the Court finds that the admission of testimony of the above-referenced witnesses did not violate due process. Therefore, the state court's

1    rejection of this claim was objectively reasonable.  Himes, 336 F.3d at 853.

2    **VI.      CONCLUSION**

3              For the foregoing reasons, the petition for a writ of habeas corpus is DENIED as to all

4    claims.  The Clerk of the Court shall enter judgment, terminate all pending motions, and close the

5    file.

6              IT IS SO ORDERED.

7

8    DATED: 1/21/09

9                                                   _____
                                                    SAUNDRA BROWN ARMSTRONG
10                                                  United States District Judge

1

2

3

4

5

6  UNITED STATES DISTRICT COURT
   FOR THE
7  NORTHERN DISTRICT OF CALIFORNIA

8
   WILLIE CLARENCE RAY,
9                                          Case Number: CV06-04556 SBA
           Plaintiff,
10                                         **CERTIFICATE OF SERVICE**
     v.
11
   SCOTT KERNAN et al,
12
           Defendant.
13 _____/

14
   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
15 Court, Northern District of California.

16 That on January 22, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
   copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
17 envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
   located in the Clerk's office.

18

19

20

21 Willie C. Ray T-73523
   California State Prison-Sacramento (New Folsom)
22 P.O. Box 29-0066
   Represa, CA 95671
23
   Dated: January 22, 2009
24
                                          Richard W. Wieking, Clerk
25                                        By: LISA R CLARK, Deputy Clerk

26

27

28

P:\PRO-SE\SBA\HC.06\Ray4556.denyHC.frm                42

**United States District Court**
For the Northern District of California